**In re MAJOR FUNDING CORPORATION,**
**Debtor.**

**Bankruptcy No. 87–01026–H3–11.**

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Oct. 2, 1997.

---

## MEMORANDUM OPINION

LETITIA Z. CLARK, Chief Judge.

The court has heard the Second Application To Approve Advisory Committee's Employment of Counsel (Docket No. 4011), filed by the Advisory Committee of Major Funding Corporation ("Committee"). After considering the pleadings, evidence, and arguments of counsel, the court makes the following findings of fact and conclusions of law, and will enter a separate Judgment approving the employment of Weycer, Kaplan, Pulaski & Zuber ("WKPZ"). This employment is initially limited in scope, and fees and expenses are subject to review by the bankruptcy court. To the extent any of the findings of fact herein are construed to be conclusions of law, they are hereby adopted as such. To the extent any of the conclusions of law herein are construed to be findings of fact, they are hereby adopted as such.

## A BRIEF HISTORY

This is a case in which the original corporation was a purchaser of notes on homes, and on home improvements, (which it sometimes participated in encouraging, thereby creating the opportunity for its lien), all generally relating to homes in a lower income market. The corporation then marketed itself to investors through advertisements in newspapers and elsewhere, offering the investors a chance to earn eighteen percent (18%) on their money in a "risk free" environment in which they were "fully secured" by the notes. The Texas Attorney General became interested in Major Funding, and eventually obtained, in the state courts, various cease and desist orders against the corporation, aimed at its activities on both fronts—to cease encouraging the creation of and acquisition of the liens on peoples' homes, and to cease marketing itself to investors in the glowing terms it had used in its advertisements. The State referred to the operations of the corporation as a "pyramid scheme." The principal of the corporation, one James Sorce, was eventually indicted and apparently fled the country. After the cease and desist orders, the debtor filed bankruptcy. Over fifteen hundred (1500) investors were left with claims of approximately fifty million dollars against the debtor. After confirmation of a plan on April 10, 1991 (Docket No. 3194), Ronald J. Sommers was appointed as the Liquidating Trustee under the plan ("Trustee"). He is a trustee of extensive experience in complex cases in this district, in state court as well as in bankruptcy court. He testified extensively at the hearing on this matter. He was calm, courteous, credible, and well informed about the Liquidating Trust, of which he is the fiduciary. The Plan also created an Advisory Committee pursuant to its Article VII, Subsection B, to carry

out duties under 11 U.S.C. § 1103, and to advise and consult with the Liquidating Trustee on post confirmation operations and expenses.

The Trustee began the process of organizing the papers left by the corporation. The corporation had promised its investors that they would be fully secured in particular properties, "their" properties, the deeds on which the corporation would hold as a matter of convenience. It had assured them that they could have deeds issued in the investors' names if they so chose. Some did so choose, and some parcels were "deeded" to more than one individual. One of the Trustee's first duties, in dealing with a very angry body of investors who felt themselves defrauded by the corporation, was to begin litigation to recover these parcels from those individual investors, and to retain those properties for the benefit of all the investor class. In this, he was eventually successful. This angered those investors who had obtained "deeds."

The records of the corporation were in disarray, and the process of locating the documents identifying the properties was itself somewhat difficult. Not all the papers were well drawn, and this also occasioned some litigation to establish the nature and extent of the liens held by the corporation. It was also necessary to reach settlements with the State of Texas Attorney General. The Trustee also began the process of trying to collect the monies for mortgage and home improvement loans from the homeowners. In this, he has over the years obtained a fair degree of success.

Once the Trustee had the deeds and home improvement liens in sufficient order that they might, with accuracy, be called a "portfolio", he initiated the process of determining if there was a market for this "portfolio". In October, 1992, the Trustee identified several capable buyers for the portfolio, and put the proposed purchase before the Advisory Committee. They turned the offer down, apparently believing that the properties in the portfolio could be managed to yield more over time than was reflected in the "present value" represented by the offer. (Testimony of Michael Jayson).

This, in effect, shifted the job of the Trustee from that of making the portfolio saleable to that of managing the properties. To that end, he employed Ms. Ilsa Pappas, who testified before the court, and appears highly capable and effective. She testified, *inter alia*, that she makes many of her monthly collections in person at the properties, often with her husband (unpaid) as her companion, in view of the neighborhoods she visits for this purpose, and the attitude of some of the homeowners. All members of the Creditors' Committee who testified seem satisfied with her work and with her responsiveness if they call with questions or a desire to visit the office from which the affairs of the Liquidating Trust are managed. She testified that she has also made it clear that any of them who wish are welcome to observe any of the collections process as she makes her rounds, but that none have taken up this offer.

Notwithstanding their respect for Ms. Pappas and her accessibility, there came a time when some members of the Committee believed that the process of bringing to order the affairs of this debtor, and thereafter, the management of the properties, was taking too much time and costing too much money.

## EVENTS LEADING TO THE INSTANT MATTER

The Committee filed an Application To Employ Counsel (Docket No. 3958). The Trustee opposed the application on the ground that the Plan did not specifically authorize the Committee to retain counsel. This court denied the employment application (Docket No. 3969). The United States District Court for the Southern District of Texas affirmed. The Fifth Circuit Court of Appeals reversed and remanded for this court to determine if there was a necessity for counsel for the Advisory Committee (Docket No. 4016; *Matter of Advisory Committee of Major Funding Corp.*, 109 F.3d 219 (5th Cir.1997)). The Committee filed a Second Application to employ WKPZ. The Second Application was opposed by the Trustee on the basis that the Committee does not need counsel, and that the Trustee would be violating his fiduciary duty to the Liquidating Trust if he failed to so urge. It is this

Second Application which is presently under consideration by the court.

## DISCUSSION

■ The question of whether the Advisory Committee needs counsel is a troublesome one. Initially, it is not clear that most of the fifteen hundred (1500) investors believe that such counsel is needed, or want the fees and expenses of such counsel to come out of the assets collected by the Trust. This is so because, so far as appears in the record, these investors have not been polled on this question. So far as appears in the record, no bylaws have been created for the election of the Advisory Committee members, or for determining what issues should be put before the Committee, or before the entire class of investors, for a vote. While this is a Committee created by a plan, its duties are identified in the plan by reference to 11 U.S.C. § 1103. Pursuant to 11 U.S.C. § 1103, the most common method for a committee to establish governance procedures is by adopting bylaws. 7 *Collier on Bankruptcy* ¶ 1103.02, 1103.05 (Matthew Bender, 15th Ed. Revised 1996). The Committee should also strive to achieve unanimity. The committee is charged with representing the interests of its constituency and each member should be keenly aware of its duty to the entire constituency. While the bylaws will presumably allow the committee to act in most instances without unanimous approval, such situations should be avoided whenever possible. 7 *Collier on Bankruptcy* ¶ 1103.02[2] (Matthew Bender, 15th Ed. Revised 1996).

J. Dirk DeJong is the Chairman of the Committee for the Debtor. The court notes that Mr. DeJong was one of the investors in Major Funding. He is now retired from his previous employment, and devotes considerable time to attempting to recoup some of his investment in Major Funding by exercise of his own conception of how the surviving Liquidating Trust should be managed.

Mr. DeJong testified extensively before the court at the hearing on this matter. He exhibited strong personal feelings about how the Liquidating Trust should be managed, and considerable hostility toward the Trust-

ee. He seemed satisfied with the work of Ms. Pappas. His stewardship of the Committee has not resulted in any bylaws, and his method of polling his Committee appears informal at best. It does not appear that during his stewardship he has ever caused to be polled the investor class as a whole. He has tried to "piggyback" some communications onto various mailouts the Trustee has sent to the entire investor class. This the Trustee has declined, and this appears to have angered Mr. DeJong. Mr. DeJong is so angry, first at the loss of his money to Major Funding Corporation, and now at the slow process of partial recovery in which the Trustee is engaged, that his testimony was not fully credible.

■ In view of the Committee's inability thus far to function effectively without the assistance of counsel, even in the most basic area of establishing representative self governance, the court concludes that counsel is needed, at least to the extent of assisting the Committee in the creation of bylaws to accomplish this goal. These bylaws must include terms dealing with those occasions which call for polling the entire investor class, and the manner in which such polls are to be taken. Once these have been established, an estimate of the cost of various tasks which Mr. DeJong would like the Committee's counsel to undertake, including requesting counsel to bring an action against the Trustee, can be obtained from the selected counsel, and made available to the investor class who will in effect be funding these actions out of the monies collected by the Liquidating Trust. Accordingly, the court approves the employment of WKPZ for the initial purpose of assisting the Committee in establishing representative self governance.

■ When a committee retains an attorney or other professional, the terms of such employment should be clearly established at the outset. All compensation is awarded by the court. Any entity seeking compensation or reimbursement from the estate must submit to the court an application conforming to the requirements of Bankruptcy Rule 2016(a). This rule applies to a creditor, committee, or other entity that files an application for payment by the estate of fees of

professionals retained by the entity. The rule is clearly meant to cover all applicants seeking compensation pursuant to section 330 of the Code. This includes trustees and examiners, as well as persons employed pursuant to sections 327 and 1103 of the Bankruptcy Code. 7 *Collier on Bankruptcy* ¶ 1103.03 and 2016.03 (Matthew Bender, 15th Ed. Revised 1996). Proposed counsel argue that since this is a post confirmation Advisory Committee, he should not have to comply with these statutory and rule safeguards. The court is not persuaded that counsel is entitled to be exempted from these safeguards. Even if it were permissible for counsel to be excepted from these safeguards, it would not be advisable in this case, in light of the Advisory Committee's fledgling status as an entity able to representatively govern itself. Thus, the court finds that WKPZ is required to comply with Bankruptcy Rule 2016 and Bankruptcy Local Rule 2016, setting forth the standards for submission of fee applications to the court. All fee applications submitted to the court by WKPZ will be subject to the court's review and approval prior to payment by the Liquidating Trust.